O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

GIBSON BRANDS, INC., a          )   Case No. CV 14-00609 DDP (SS)
Delaware Corporation,           )
                                )   **ORDER DENYING MOTION FOR LEAVE TO**
                Plaintiff,      )   **MODIFY SCHEDULING ORDER TO FILE**
                                )   **FIRST AMENDED COMPLAINT**
        v.                      )
                                )   [Dkt. No. 78]
JOHN HORNBY SKEWES & CO.,        )
LTD., a United Kingdom          )
corporation and DOES 1          )
through 10                      )
                                )
                Defendants.     )
_____

      Presently before the Court is a motion by Plaintiff Gibson

Brands ("Gibson") to amend the scheduling order and for leave to

file a First Amended Complaint.  (Dkt. No. 78.)[1]  Having considered

the parties' submissions, the Court adopts the following order.

**I.    BACKGROUND**

      In its Complaint, filed January 27, 2014, Gibson alleges that

it is the sole owner and designer of the six design trademarks at

_____

      [1]One day after filing its motion, Plaintiff filed an "amended"
motion.  (Dkt. No. 80.)  As there is no procedural mechanism for
amending motions, and as allowing moving parties an unfettered
right to change their motions after they are filed would tend to
cause confusion, the Court does not recognize the "amended" motion
and rules on the motion as initially filed.

1  issue: (1) SG Body Shape Design; (2) Explorer Body Shape Design;

2  (3) ES Body Shape Design; (4) Flying V Body Shape Design; (5)

3  Flying V Peghead Design; and (6) Kramer Peghead Design. Gibson

4  alleges that its trademarks are famous both in the U.S. and

5  elsewhere, and that Gibson is the exclusive user of its trademarks.

6  (Compl. generally.)

7      Gibson alleges that John Hornby Skewes & Co. ("JHS") has

8  repeatedly used Gibson's trademarks in connection with such

9  products without authorization by Gibson. (Id.) Specifically,

10 Gibson alleges that JHS intended to mislead consumers into

11 believing that JHS' products are made by Gibson, or that JHS'

12 products are authorized or licensed by Gibson, so that JHS would

13 benefit from Gibson's valuable reputation. (Id.)

14     At some unspecified time, Gibson alleges, JHS posted copies of

15 third-party reviews of its allegedly infringing products on its

16 website.  (Pl.'s Mot. Amend, Ex. B, ¶ 7 & Ex. 2.)  The reviews

17 refer to "Gibson-styled" guitars; state that JHS's products

18 "maintain[] the Gibson vibe"; describe pickups (electronic

19 components) that "are based very closely on the design of the

20 original vintage Gibson PAF" and "what looks like three of Gibson's

21 antique single-coils," as well as "neck profiles that are based

22 loosely on the neck from Trev's treasured and much-missed early 60s

23 Gibson SG standard"; and describe JHS products as "closely based on

24 . . . [the] 60s Gibson SG Special," "inspired by the neck pattern

25 of a genuine early 60s Gibson," "more or less identical to the

26 original Gibson guitars that inspired them," "convey[ing] the

27 slimmer feel generally associated with Gibson guitars dating from

28 around 1960 onwards with the added stability of a more modern

2

instrument," "evocative of Gibson's finest period ES-335s," and "look[ing] old Gibson." (Id.)  One review also states that a "slight cutaway on the bass-side of the guitar" is "part of an agreement that JHS has with Gibson, we understand." (Id.)  The original Complaint does not make any reference to these reviews. Gibson alleges that these reviews, as used on JHS's website, infringe five Gibson word marks. (Pl.'s Mot. Amend at 4.)

In May 2015, Gibson took the deposition of Mr. Dennis Drumm, a JHS corporate representative. (Id. at 4.) During the deposition, Mr. Drumm allegedly revealed that JHS controls the content on its website, including the posting of third-party reviews. (Pl's Mot. Amend, Ex. B, Ex. 3 at 68-69.)  On June 11, 2015, Gibson received the deposition transcript, and filed a motion to modify the pretrial Scheduling Order to permit the filing of its Amended Complaint. (Id. at 11.)

JHS opposes Gibson's motion to modify the Scheduling Order for three reasons: (1) Gibson did not satisfy the meet and confer rule as required under Local Rule 7-3; (2) Gibson has not shown that it has a good cause for amending the scheduling order because Gibson was not diligent in filing its motion; (3) allowing leave for amend would cause undue delay in the trial proceedings, would prejudice JHS, and would be futile. (Opp'n. to Pl's Mot.)

**II.  LEGAL STANDARD**

    **A. Rule 16**

A party can modify a pretrial scheduling order if the party cannot reasonably meet the dates on the order, notwithstanding the moving party's diligence. <u>Johnson v. Mammoth Recreations, Inc.</u>, 975 F.2d 604, 609 (9th Cir. 1992).  Schedules may be modified only

3

for good cause and with the judge's consent. Fed. R. Civ. P.
16(b)(4). When a party moves to modify the scheduling order to
amend a pleading, the court determines good cause by focusing on
the diligence of the moving party.   Id.

**B. Rule 15**

"Only after the moving party has demonstrated diligence under
Rule 16 does the court apply the standard under Rule 15 to
determine whether the amendment was proper." Hood, 567 F.Supp.2d
1221 at 1224 (citing Mammoth Recreations, 975 F.2d at 608). Leave
to amend should be freely given when justice requires, so long as
there is no undue delay in the litigation and prejudice to the
nonmoving party. See Foman v. Davis, 371 U.S. 178, 182 (1962). When
deciding the propriety of a motion for leave to amend the court
will consider factors such as undue delay, prejudice to the
opposing party, and futility of the amendment. See Allen v. City of
Beverly Hills, 911 F.3d 367, 373 (9th Cir. 1990).

**III. DISCUSSION**

**A.   Local Rule 7-3**

As an initial matter, JHS contends that Gibson failed to abide
by Local Rule 7-3, because Gibson's counsel only emailed JHS's
counsel rather than conferring in real time.   JHS cites to Caldera
v. J.M. Smucker Co. for the proposition that 7-3 conferences should
"take place via a communication method that, at a minimum, allows
all parties to be in realtime communication (letters and email, for
example, do not constitute a proper 7-3 conference)."   No. CV
12-4936-GHK VBKX, 2013 WL 6987905, at *1 (C.D. Cal. June 3, 2013).
But in Caldera Judge King was referring to a specific case
management order requiring realtime conferences.   While such a

4

requirement is a sensible means of facilitating the goals of LR 7-3, it is not the only means of doing so. The rule itself requires only that, at least seven days prior to filing a motion, "counsel contemplating the filing of any motion shall first contact opposing counsel to discuss thoroughly, preferably in person, the substance of the contemplated motion and any potential resolution." A substantial email exchange could meet these requirements.

In this case, however, Gibson's counsel did not meet the rule's requirements, both because the emails here do not constitute a "thorough" discussion of the issues and because counsel waited until the day before he filed the motion to email opposing counsel. (Opp'n, Ex. A.)

In the interest of avoiding unnecessary delay, and because JHS does not appear to have been prejudiced by Gibson's failure to satisfy the rule,[2] the Court declines to vacate the motion on this ground. But the Court hereby orders the parties to comply with the Local Rules in all future filings; failure to do so may result in sanctions, including denial of the improperly filed motion.

## B. Good Cause Requirement under Rule 16

JHS contends that Gibson cannot show good cause for modifying the Scheduling Order, and therefore, Gibson's motion should not be granted.

In examining diligence, the court may consider, among other things, (1) whether the party was diligent in assisting the court in creating a workable Rule 16 order; (2) whether the party's

---

[2] See Brodie v. Bd. of Trustees of California State Univ., No. CV 12-07690 DDP AGRX, 2013 WL 4536242, at *1 (C.D. Cal. Aug. 27, 2013) (court considered the motion on the merits where opposing party was not prejudiced by failure to follow rule 7-3).

failure to meet the Rule 16 order occurred notwithstanding the
party's diligent efforts to comply, due to the development of
matters that were not reasonably foreseeable at the time of the
Rule 16 scheduling conference; and (3) whether the moving party was
diligent in seeking amendment of the Rule 16 order, once it became
apparent that the party would not be able to comply with the order.
<u>Hood v. Hartford Life and Acc. Ins. Co.</u>, 567 F.Supp.2d 1221, 1224
(E.D. Cal. 2008).  The parties agree that Gibson was diligent under
the first factor. (Opp'n. at 5.)  However, JHS contends that Gibson
was not diligent under the other two factors identified in <u>Hood</u>,
because such material existed on JHS' website well before Gibson
filed its complaint, and so it was reasonably foreseeable that this
material would support Gibson's new claims. (<u>Id.</u>)

    The Court cannot discern from the moving papers exactly when
Gibson discovered the allegedly infringing reviews, nor what steps,
if any, Gibson took to uncover possible word mark infringement in
association with the alleged design mark infringement.[3]  In its
reply, Gibson states that it "recently" found the reviews.  (Reply
at 5.)  Ric Olsen, Gibson's "Manager of Brand Protection," states
in his declaration that Gibson was not aware of the reviews until
*after* the deposition of JHS' corporate representative, Dennis
Drumm.  (Decl. Ric Olsen, ¶ 10.)  But this assertion makes little
sense in light of the deposition transcript showing that the
reviews were discussed during the deposition, and that Gibson's

---

    [3]Gibson alleges that it sought "documents that referred to
Gibson, ES, SG, FLYING V, or EXPLORER" in discovery but cites only
to a request for production of documents filed by *JHS*.  (Reply at 5
(citing Pl.'s Mot. Amend, Ex B, Ex. 2 (Defendant's RFP)).)

1  counsel had at least some of the reviews at hand to discuss with

2  Mr. Drumm.  (Pl's Mot. Amend, Ex. B, Ex. 3 at 78-81.)

3       Gibson nonetheless argues that before it could file a motion

4  to amend its complaint, it had to take Mr. Drumm's deposition in

5  order to confirm that JHS was in control of the marketing materials

6  and reviews displayed on its website. (Pl's Mot. Amend at 9.)

7  Gibson argues that it is not uncommon for a company to work with

8  third-parties to develop a company's website. (Reply at 6.)  In

9  order to determine whether JHS was in control of the marketing

10 materials on its website, Gibson sought to schedule depositions for

11 five months.  (Pl's Mot. Amend at 8; Schuettinger Decl. at ¶ 3.)

12 Once the depositions were taken, Gibson filed its motion to modify

13 the Scheduling Order within one week. (Pl's Memo in Supp. Mot. at

14 9; Schuettinger Decl. at ¶ 4.)  Thus, Gibson suggests, it could not

15 have sought amendment of the scheduling order any sooner.

16      But this argument makes little sense.  Of course a company

17 may "outsource" development of a website, (Reply at 6), but it is

18 still responsible for the content of the site and, at a minimum,

19 may be held vicariously liable for the developer's actions.

20 R.F.M.A.S., Inc. v. Mimi So, 619 F. Supp. 2d 39, 71 (S.D.N.Y.

21 2009) ("Even when the indirect infringer has no knowledge of the

22 direct infringement, it can still be held liable for vicarious

23 infringement if it has the right and ability to supervise the

24 infringing activity and also has a direct financial interest in

25 such activities.") (internal quotation marks and brackets

26 omitted).  Gibson provides no authority to the contrary, and no

27 reason to think it was not reasonably foreseeable that JHS would

28 be liable for alleged infringement on its own website.

1  The Court finds that Gibson has not shown good cause under

2  Rule 16 to modify the scheduling order.

3  **B. Prejudice and Futility Under Rule 15**

4  Even if Plaintiff had shown good cause to amend the

5  scheduling order, the motion would still have to be denied under

6  Rule 15.

7  First, JHS argues that amendment would be futile.  The test

8  for futility is the same as the test for dismissal under Rule

9  12(b)(6) – i.e., whether, taking a plaintiff's facts as true, the

10  allegations state a plausible claim for relief.[4]  On the proposed

11  allegations, it is far from clear that Plaintiff can state a

12  plausible claim for word mark infringement.

13  The elements of trademark infringement are a valid,

14  protectable trademark and a defendant's use of the mark in a way

15  that is likely to cause consumer confusion.  Applied Info.

16  Sciences Corp. v. eBAY, Inc., 511 F.3d 966, 969 (9th Cir. 2007).

17  Where the trademark is used to name the plaintiff's product itself

18  – rather than being used by the defendant to identify its own

19  products – the typical likelihood-of-confusion analysis is

20  replaced with a "nominative fair use" analysis, which requires

21

22  _____

    [4]Plaintiff urges the Court to use the futility standard
23  announced in Miller v. Rykoff-Sexton, Inc.: "A proposed amendment
    is futile only if no set of facts can be proved under the amendment
24  to the pleadings that would constitute a valid and sufficient claim
    or defense."  845 F.2d 209, 214 (9th Cir.1988).  But that "no set
25  of facts" standard was taken from the pleading standard courts had
    borrowed from dicta in Conley v. Gibson, 355 U.S. 41, 45–46 (1957);
26  as the Miller court noted, the test for futility is the same as the
    test applied on a Rule 12(b)(6) motion.  845 F.2d at 214.  After
27  Ashcroft v. Iqbal, that pleading standard is no longer viable.  556
    U.S. 662, 678 (2009).  Thus, the proper standard is Iqbal's
28  plausibility standard.  Fulton v. Advantage Sales & Mktg., LLC, No.
    3:11-CV-01050-MO, 2012 WL 5182805, at *2 (D. Or. Oct. 18, 2012).

that (1) the plaintiff's product not be readily identifiable without use of the trademark, (2) the defendant only use so much of the mark as reasonably necessary to identify plaintiff's product, and (3) the defendant not suggest that the plaintiff sponsors or endorses the defendant's product or service. <u>Cairns v. Franklin Mint Co.</u>, 292 F.3d 1139, 1151 (9th Cir. 2002).

The archetypal case of nominative fair use is one in which a publication uses the trademarked name of a product or organization in order to discuss its merits. <u>New Kids on the Block v. News Am. Pub., Inc.</u>, 971 F.2d 302, 308 (9th Cir. 1992) (newspaper could not be expected to refer to the band New Kids on the Block as an entity "without using the trademark," and the same logic applied to "the Chicago Bulls, Volkswagens or the Boston Marathon"). Notably, the nominative fair use doctrine applies "even if the defendant's ultimate goal is to describe his own product." <u>Cairns</u>, 292 F.3d at 1151.

Some courts have declined to dismiss a trademark claim based on the nominative fair use doctrine; however, Plaintiff points to no case holding that a trademark infringement claim can *never* be resolved on a motion to dismiss.[5]   Indeed, a number of courts have

---

[5] <u>See, e.g.</u>, <u>Autodesk, Inc. v. Dassault Systemes SolidWorks Corp.</u>, No. C08-04397 WHA, 2008 WL 6742224, at *5 (N.D. Cal. Dec. 18, 2008) ("[A]nalysis of nominative fair use is premature on a motion to dismiss, particularly given the factual nature of the inquiry *in this case*.") (emphasis added); <u>Yeager v. Cingular Wireless LLC</u>, 627 F. Supp. 2d 1170, 1178 (E.D. Cal. 2008) (court could not find third element of nominative fair use test satisfied as a matter of law, and therefore could not dismiss); <u>Designer Skin, LLC v. S&L Vitamins, Inc.</u>, No. CV 05-3699 PHXJAT, 2007 WL 841471, at *2 (D. Ariz. Mar. 19, 2007) (denying motion to dismiss because "after identifying the three prongs of nominative fair use, Defendants fail to apply them to this case"); <u>Films of Distinction, Inc. v. Allegro Film Prods., Inc.</u>, 12 F. Supp. 2d 1068, 1077 (C.D.
(continued...)

held that an argument of nominative fair use *can* support a motion
to dismiss, if "the pleadings fail to allege a mark use beyond
nominative fair use." <u>Stevo Design, Inc. v. SBR Mktg. Ltd.</u>, 919 F.
Supp. 2d 1112, 1124 (D. Nev. 2013).  <u>See also</u> <u>Architectural</u>
<u>Mailboxes, LLC v. Epoch Design, LLC</u>, No. 10CV974 DMS CAB, 2011 WL
1630809, at *3 (S.D. Cal. Apr. 28, 2011) (dismissing claim where
the allegedly infringing use of plaintiff's trademarked name
"clearly identify Plaintiff as the manufacturer" of competing
goods); <u>Elec. Arts, Inc. v. Textron Inc.</u>, No. C 12-00118 WHA, 2012
WL 3042668, at *5 (N.D. Cal. July 25, 2012) (dismissal appropriate
where "simply looking at the work itself, and the context in which
it appears, demonstrates how implausible it is that a viewer will
be confused into believing that the plaintiff endorsed the
defendant's work").

    It is clear that Gibson's claim would fail as a matter of law
if brought against the original reviewers or the publications that
ran their reviews; that is simply <u>New Kids</u> redux.  But then it
seems odd to say that by re-publishing the very same content, JHS
somehow becomes liable for trademark infringement, unless its
website either misleadingly edits the reviews (not at issue here,
as the articles appear to be reprinted in full) or explicitly
cites to them as support for a claim of endorsement.

    Gibson argues that because the reviews refer to JHS as a
"copycat" and its products as "inspired by," "copies" or "knock-

---

[5](...continued)
Cal. 1998) ("[T]he applicability of the nominative fair use
exception cannot be determined on a motion to dismiss *absent*
*allegations establishing that the product or service is readily*
*identifiable without use of the trademark*.").

offs" of, or "more or less identical to" certain Gibson guitars, consumers will assume an endorsement. (Reply at 12-13. The problem is that when taken in context, the references to Gibson actually reinforce the idea that Gibson does *not* endorse the JHS guitars. To start with, the plain meaning of the words "copycat" and "knock-off" incorporates a sense that the copying is not authorized. But more to the point, the reviews frequently assert that the specific products being reviewed are the *opposite* of a copy:

> [W]ith the launch of the Advance series, copy cloning is put on the back burner in favour of some more original designs – namely, the four examples on test here.

> [T]he shape, because it apes Gibson and can't copy it, looks rather ungainly . . . .

> JHS's MD Dennis Drumm and Trev Wilkinson unveiled the fledgling Vintage Advance series: inspired by the classics, but certainly not copies. 'What we're trying to do is say we're not a copy company any more,' explained Trev Wilkinson. 'We have the wherewithal to innovate.'"

(Pl.'s Mot. Amend, Ex. B, Ex. 2.) The reviews also emphasize the JHS products' original components, noting that the JHS guitars "feature various specs put together by Trev" and "use custom designed Wilkinson humbucking pickups." (Id.) The only statement in the reviews that even suggests an endorsement is the aside that a design feature is used as "part of an agreement that JHS has

1   with Gibson, we understand." (Id.) But a single such statement,

2   qualified as it is and buried in pages and pages of third party

3   reviews, cannot support a conclusion that consumers would be

4   confused into thinking that Gibson endorses JHS's product line as

5   a whole.

6        More generally, it cannot be the case that a manufacturer may

7   not make marketing use of third-party reviews of its products if

8   the reviews make comparisons to other brands.  Such reviews are

9   one of the most important indicators of quality that a

10  manufacturer has with which to distinguish its products.  And

11  where a product is either an explicit copy of, or "inspired by,"

12  another firm's work, it is natural for the reviewer to compare the

13  copy to the original.  This kind of review-by-genealogy is so

14  common that no reasonable consumer is confused by it into thinking

15  that the creator of the original work must be endorsing the new

16  work.  When the *Village Voice* notes that Quentin Tarantino's

17  *Django Unchained* is a "direct homage" to the spaghetti westerns of

18  Sergio Leone, who in turn got his start lifting a story from Akira

19  Kurosawa, who in turn took his plot from Dashiell Hammett, no one

20  thinks that Hammett, Kurosawa, and Leone have endorsed on

21  Tarantino's film.[6]  Reprinting of reviews that mention Gibson's

22  products, alone, cannot be enough to trigger a word mark

23  infringement claim; there must be some additional allegation

24  showing that JHS used the reviews in a way that was misleading.

25  Such an allegation is lacking here.

26

27       [6]Vern, "How to Defend Quentin Tarantino," Village Voice (Jan.
    2, 2013),

28  http://www.villagevoice.com/film/how-to-defend-quentin-tarantino-64
    37096.

12

1    Because Gibson's proposed amendments do not suffice to state
2    a claim against JHS, JHS has a strong argument that amendment
3    would be futile.

4    But even if the word mark claims were not so implausible as
5    to be subject to dismissal, the proposed amendments would still
6    result in substantial prejudice to JHS.  Undue prejudice exists
7    when new claims in an amended complaint significantly alter the
8    nature of the litigation and require defendants to undertake an
9    entirely new course of defense.  <u>Morongo Band of Mission Indians</u>
10   <u>v. Rose</u>, 893 F.2d 1074, 1079 (9th Cir. 1990).  The nominative fair
11   use issue discussed above would presumably require a revamping of
12   Defendant's litigation strategy, including additional discovery
13   (especially regarding consumer beliefs about endorsement as to
14   third-party reviews).  JHS also raises serious questions as to
15   whether the reviews were used "in commerce" in the United States,[7]
16   and this, too, would require a new course of defense and perhaps
17   additional discovery.  Thus, Gibson's proposed amendments, coming
18   this late in the process, would unduly prejudice JHS's defense.
19   **IV.  CONCLUSION**

20   For all the above reasons, the Court DENIES Gibson's motion.
21   Additionally, although Gibson has suggested that if its motion
22   were denied it would be forced to file a separate complaint
23   alleging its word mark claims, that possibility is foreclosed by
24   this order.  "Plaintiffs generally have no right to maintain two
25   separate actions involving the same subject matter at the same

26

27       [7]<u>See</u> Opp'n at 14-17 (arguing that the use of the reviews did
28   not result in an effect of commerce, or cognizable injury, within
     the United States).

time in the same court and against the same defendant." <u>Adams v.</u>
<u>California Dep't of Health Servs.</u>, 487 F.3d 684, 688 (9th Cir.
2007).   A plaintiff may not "attempt[] to avoid an unfavorable
prior ruling in one case by filing essentially the same claims in
a new case."   <u>Stearns v. Ticketmaster Corp.</u>, 655 F.3d 1013, 1025
(9th Cir. 2011).


IT IS SO ORDERED.



Dated: August 4, 2015

DEAN D. PREGERSON
United States District Judge